The First National Bank of Chicago and Edna S. Schram Hirsh, as Trustee Under the Last Will of Jack A. Schram, Deceased, Plaintiffs-Appellees, v. Victor Comptometer Corporation, Defendant-Appellant.

Gen. No. 53,166.

First District.

April 17, 1970.

Vernon R. Loucks, and Peterson, Lowry, Rall, Barber & Ross, of Chicago (Timothy G. Lowry, Owen Rall, and John R. Porter, of counsel), for appellant.

Leibman, Williams, Bennett, Baird & Minow, and Clausen, Hirsh, Miller & Gorman, of Chicago, for appellees.

MORAN, P. J.

This is an appeal by the defendant, Victor Comptometer Corporation, from a summary judgment entered by the Circuit Court of Cook County which ordered the defendant to deliver 1282 shares of its stock to the plaintiff.

Prior to March 24, 1959, Jack Schram and William Schaffner were owners of Burke Golf Equipment Corporation, Burke Golf Sales, Inc., and National PGA Distributors, Inc., a subsidiary of the sales company. These companies were engaged in the manufacturing and marketing of golf equipment. In early 1959 Schram and Schaffner entered into negotiations with Comptometer Corporation (predecessor of defendant) concerning the sale of the businesses to Comptometer. On March 3, 1959, the parties executed a Memorandum of Intent which specified the details of the transaction. Subsequently, on March 24, 1959, the "Agreement" was executed. Under the terms of this agreement the defendant acquired all of the stock of the Burke Companies. In addition to other consideration, the agreement provided:

"4. *Issuance of Additional Common Shares in respect of Earnings.* Comptometer agrees, as additional consideration for the shares of capital stock to be purchased under Subdivision A of Paragraph 2 of this Agreement that, if during each of the three fiscal years of the Equipment Corporation, ending September 30, 1960, September 30, 1961 and September 30, 1962, the aggregate net earnings of the Equipment Corporation and the Sales Company consolidated before provision for Federal income taxes, are in excess of $135,000, (or if, on a cumulative basis, such net earnings for any two or three of said three years averages $135,000 or more per year) Comptometer will issue to the Sellers, within 60 days after the close of each such fiscal year, in equal proportions, one Comptometer Common Share, par value $1 per share, for each $13 of such excess net earnings; provided that the maximum aggregate number of Common Shares issued with respect to such excess net earnings in any such fiscal year shall not exceed 2,564 Common Shares, and with respect to said three years, shall not exceed an aggregate of 7,692 Common Shares."

For the fiscal year ending September 30, 1960, the net earnings were $221,973.83 and for 1961, $165,969.82. After each of these fiscal years the defendant issued 1282 shares to both Schram and Schaffner, or 2564 per year for a total of 5128. The net earnings for fiscal year 1962 were $54,423. No additional stock was issued.

The plaintiff's complaint and amended complaint alleged that it is the executor of the estate of Jack A. Schram, deceased; that it has not received an accounting of the results of the operation of the Equipment Corporation for the fiscal year ending September 30, 1962; that on information and belief the aggregate net earnings exceeded the sum of $135,000 for fiscal year 1962, or, al-

ternatively, averaged at least $168,332; and that the plaintiff was entitled to 1282 additional shares of Victor Comptometer stock in accordance with paragraph 4 of the agreement. The defendant's answer denied these allegations.

Subsequently the plaintiff filed a motion for summary judgment. The motion alleged that the defendant had furnished the plaintiff a financial statement and that in accordance with the plain provisions of Paragraph 4 of the Agreement and the contents of the financial statement, Victor was obligated to issue to plaintiff the 1282 shares of Victor. After an answer to the motion and a reply to the answer, and various affidavits were filed, the court ordered the motion for summary judgment granted. In its decree the court stated:

"4. That, solely for the purposes of Plaintiff's motion, the net earnings of Burke Golf Equipment Corporation and Burke Golf Sales, Inc., for the fiscal year ended September 30, 1960, amounted to $221,-973.83; that solely for the purposes of Plaintiff's motion, the net earnings of said two companies for the fiscal year ended September 30, 1961, amounted to $165,969.82; that the aggregate net earnings of said two companies for the said two fiscal periods were $387,943.65 and that the average net earnings of said two companies for the said two fiscal periods amounted to $193,971.82.

"5. That applying the formula set forth in the parentheses appearing in the first sentence of Paragraph 4 (of the agreement) quoted above, the average excess net earnings of said two companies for the fiscal year ended September 30, 1960, after deducting the sum of $135,000.00 as provided in said first sentence, were $58,971.82, and the average excess net earnings of said two companies for the fiscal period ending September 30, 1961, after deducting

338

said amount of $135,000.00 as provided in said first sentence, were $58,971.82; that the total excess net earnings for both of said fiscal years, computed as aforesaid, amounted to $117,943.64; that on the basis of the formula set forth in said parentheses there are sufficient excess net earnings for the first two fiscal years to support the issuance of 1,282 shares to the plaintiff in respect to the third fiscal year ended September 20, 1962."

Plaintiff contended in the trial court and contends now that the parenthetical language of Paragraph 4 of the acquisition agreement was an alternate method of payment plainly expressed in the agreement; that the language is clear and unambiguous and that under that language it is entitled to the 1282 shares based on the excess average net earnings of the Burke Companies during the two fiscal years ending in the years 1960 and 1961; that when Victor Comptometer earned more than the required 7692 common shares in 1960 and 1961, plaintiff is entitled to be paid the 1282 shares at the end of 1962, even though Victor Comptometer would lose money that year. It also argues that the seller could have selected the first and third years of the second and third years if the earnings for those two years were the highest, but it just happened that the earnings for the first two years were sufficient to support the issuance of the maximum number of shares for the third year.

Defendant contends that what the parties intended by the parenthetical clause must be determined not by isolating it and considering it separate and apart from the rest of Paragraph 4, but rather it must be considered in connection with all of the other words, clauses and conditions of Paragraph 4. The contract should not be construed so as to ignore and make meaningless particular words, or a particular clause or condition of the contract; that the obvious purpose of the provision that bonus

shares were not to issue until 60 days after the close of each such fiscal year was to provide a period of sixty days time after the close of each of the three fiscal years in order to determine that the net earnings for that year were sufficient to require bonus shares; that if the entire number of 7,692 bonus shares were due and owing to the sellers at the end of two years, then the clause requiring the issuance of shares for the third year to wait until sixty days after the close of the third year would be without any reasonable purpose. Obviously, the parties under the contract were given sixty days after the fiscal year 1962 to determine what, if any, bonus shares had been earned by the net earnings of 1962 when averaged with the other years.

Defendant also contends that the portion of the contract which provides that "the maximum aggregate number of common shares to be issued with respect to such excess net earnings in any such fiscal year" shall not exceed 2,564 common shares, nullified plaintiff's contention, because under plaintiff's contention the entire 7,692 shares would have been earned at the close of the second year (1961) which would mean that the shares to be issued with respect to such excess net earnings in the two years 1960 and 1961 would be in excess of the above express limitation contained in the contract. Plaintiff's construction completely ignores the above contract provision "that the maximum aggregate number of common shares issued with respect to such excess net earnings in any such fiscal year" shall not exceed 2,564.

Defendant argues that since 2,564 shares were issued and accepted for each of the fiscal years 1960 and 1961, any additional bonus shares earned would, under the above specific provision of the contract, have to be for earnings in the year 1962 as averaged with the earnings of 1960 and 1961.

In our opinion, one could read this contract and reasonably conclude that the trial court was correct in deciding

that there were sufficient excess net earnings by Victor Comptometer in the first two fiscal years to support the issuance of an additional 1282 shares to the plaintiff without regard to the earnings of Victor Comptometer for 1962. However, one could also accept defendant's version and conclude that no bonus shares were to be issued for the year 1962 without taking into consideration the earnings of the corporation for 1962 and averaging them with 1960 and 1961. Therefore, in our opinion the provision of the contract lends itself to interpretations which could result in the issuance to the plaintiff for the fiscal year 1962 of no shares, 1282 shares, or some figure in between.

An ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning. Whiting Stoker Coal Co. v. Chicago Stoker Corp., 171 F2d 248 (7th Cir); 17 CJS, Contracts, § 294.

Since this contract is capable of being understood in more senses than one, it is ambiguous and resort must be had in the trial court to evidence of extrinsic facts and circumstances to determine the true intent and agreement of the parties.

We have examined in detail the other points and authorities submitted by both sides and have come to the conclusion that, at this posture of the case, we should dispose of no other contentions.

For the foregoing reasons the judgment of the Circuit Court of Cook County is reversed and this case is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

EBERSPACHER and GOLDENHERSH, JJ., concur.